IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHARLIE D. JACKSON, #1127769,

Plaintiff(s),

vs.

KEVIN R. CHAPPELL, et al.,

Defendant(s).

No. C 14-3108 CRB (PR)

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S
MOTIONS FOR CROSS-
SUMMARY JUDGMENT

(ECF Nos. 94, 114, 125 & 168)

Plaintiff, a prisoner at the Northern Nevada Correctional Center in Carson City, Nevada, seeks damages under 42 U.S.C. § 1983 based on allegations that, while he was at San Quentin State Prison (SQSP) in San Quentin, California, correctional officer B. Burpo intentionally poisoned his food and, when plaintiff reported the poisoning, correctional officers H. De Leon, H. Altunc and K. France retaliated against plaintiff by further poisoning him, verbally abusing him and otherwise harassing him.  Plaintiff also alleges that then-warden Kevin R. Chappel and Sergeant L. Barnes were told that correctional officers were poisoning and harassing plaintiff, but neither took any steps to protect him.

Per orders filed on May 7, 2015 and January 12, 2016, the court found that: (1) plaintiff's allegations that Burpo, De Leon, Altunc and France intentionally poisoned plaintiff's food state a cognizable § 1983 claim for damages for deliberate indifference to plaintiff's health and safety against Burpo, De Leon, Altunc and France; (2) plaintiff's allegations that when plaintiff reported that Burpo was poisoning his food, De Leon, Altunc and France

retaliated against plaintiff by further poisoning him, verbally assaulting him and otherwise harassing him state a cognizable § 1983 claim for damages for retaliation against De Leon, Altunc and France; and (3) plaintiff's allegations that Chappell and Barnes were told that correctional officers were poisoning and harassing plaintiff, but neither took any steps to protect him, state a cognizable § 1983 claim for damages for deliberate indifference to plaintiff's health and safety against Chappell and Barnes.

Defendants now move for summary judgment on the ground that there are no material facts in dispute and that they are entitled to judgment as a matter of law on plaintiff's three cognizable § 1983 claims against them.  Defendants also argue that plaintiff did not exhaust available administrative remedies as to his claims against France and Chappell, as required by 42 U.S.C. § 1997e(a), and that Chappel and Barnes are entitled to qualified immunity.  Plaintiff has filed an opposition and defendants have filed a reply.  Plaintiff also has filed two cross-motions for summary judgment on both exhaustion and the merits of his claims. Defendants have filed oppositions and plaintiff has filed replies (and a surreply).

## BACKGROUND

Plaintiff was incarcerated at SQSP "between May 2010 and December 2012."  Second Am. Compl. (SAC) (ECF No. 78) at 7.  He was initially housed in the Alpine section, a protective-custody unit, but in September 2010 had himself placed in administrative segregation (ad seg) "[t]o deal with severe mental illness," including "acute social phobia, panic attacks, and depression." Id.  Plaintiff was told that "we don't house people in ad seg for having social phobia or for being antisocial or something to that effect," so he threatened to assault staff if he remained in the Alpine section in order to be moved to ad seg. Van Loh Decl. Ex. A (ECF No. 120-1) (Pl.'s Depo.) at 87.

Plaintiff was housed in ad seg between "September 2010 and November 2011." SAC at 7. He was first placed on the second tier of Carson section, where defendant France worked as a tier officer. Plaintiff alleges that "[fr]om September 2010 to December 2010," France "misappropriated" his mail, "verbally abused" him and "otherwise harassed" him. Id. at 8-9.

In December 2010, plaintiff was transferred to Donner section, another section in ad seg. Plaintiff testified that he continued to experience verbal harassment and "a lack of respect" by other correctional officers in Donner section. Pl's Depo. at 96.

In March 2011, plaintiff returned to Carson section, this time to the fourth tier, where defendant Burpo worked as a tier officer. Plaintiff alleges that "[f]rom March 2011 to May 20, 2011," Burpo "poisoned" his meals, "verbally abused" him and "otherwise harassed" him. SAC at 7.

On May 20, 2011, plaintiff alleges he became "violently sick" after eating the breakfast Burpo served him and "had to go to the emergency room because of the poisoning." Id. Later that same day, plaintiff alleges that he "submitted a grievance" regarding the incident to a correctional officer named Fry, but never received a response. Id. at 8.

On May 21, 2011, plaintiff alleges that he told defendant Barnes that Burpo had poisoned his food on May 20, 2011 "requiring him to go to the SQSP emergency room." Id. at 11. But Barnes "took no steps to protect plaintiff other than transferring plaintiff to a different cell," id., in "another section" in ad seg – "Donner Section on the second tier," Pl's Depo. at 72.

In "[l]late May or early June of 2011," id. at 75, plaintiff allegedly sent a letter to "Rylan Conner," in the Office of the Ombudsman, reporting that "Burpo had poisoned him," SAC at 8. As a result, plaintiff claims Burpo "was fired or

reassigned." Id.  But Burpo declares that he "transferred from San Quentin to California State Prison – Sacramento in June 2011 because I requested the transfer and it was approved."  Burpo Decl. (ECF No. 116) at 2.

In June 2011, plaintiff was moved to the third tier of Carson section, where defendants De Leon and Altunc worked as tier officers.  Plaintiff alleges that "[b]etween June 2011 and October 2011," De Leon and Altunc "poisoned" his meals and verbally abused him by calling him names.  SAC at 10.  Plaintiff claims De Leon and Altunc poisoned his meals and verbally abused him "in retaliation" for his submitting a grievance and letter reporting that "Burpo poisoned him."  Id.

In October 2011, plaintiff returned to the second tier of Carson section, where defendant France worked.  Plaintiff alleges that "[f]rom October 2011 to November 2011," France "poisoned" his meals, "verbally abused" him and "otherwise harassed" him.  Id. at 9.  Plaintiff claims France poisoned his meals and verbally abused and harassed him "in retaliation" for his submitting a grievance and letter reporting that "Burpo poisoned him."  Id. at 8, 9.

On November 4, 2011, plaintiff told defendant Barnes that "he was being subjected to various abuses and mistreatment," including "poisoning" and "verbal abuse," by defendants De Leon, Altunc and France.  Id. at 11-12.  But Barnes "took no steps to protect" him, id. at 12, other than to allow plaintiff to transfer to "any tier, any section" in ad seg plaintiff wanted, Pl.'s Depo. at 121.  Plaintiff chose "the fifth tier in Donner section," where none of the correctional officer defendants worked.  Id.

On November 16, 2011, plaintiff was released from ad seg back to the "Alpine section" protective-custody unit.  Pl.'s Depo. at 128-29.  He remained there until April 2012, when correctional staff moved him back to "Donner

Section" in ad seg while investigating him for possible involvement in a protective-custody prison gang. Id. at 148-49. Plaintiff testified that an officer he did not know in Donner section tampered with his food and he reported that he was suicidal. He was hospitalized for two or three days and moved to the "adjustment center" (AC), where he remained until June 2012. Id. at 150-52. Plaintiff further testified that an unidentified officer at the AC tampered with his meals. He was transferred back to Alpine section in June 2012, and was released from SQSP on December 2012.

Plaintiff alleges that defendant Chappell was "informed" multiple times by plaintiff, his mother and others that plaintiff was being "subjected to continuous and ongoing poisoning," "verbal abuse" and other "harassment and mistreatment," but Chappell "took no steps to protect plaintiff." SAC at 12-13.

## DISCUSSION

A.    Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable

trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case."  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings to demonstrate the existence of a genuine dispute of material fact by "citing to specific parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

There is no genuine issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson, 477 U.S. at 249.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Id. at 249-50.

When the parties file cross-motions for summary judgment, the district court must consider all of the evidence submitted in support of both motions to evaluate whether a genuine issue of material fact exists precluding summary judgment for either party.  The Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d 1132, 1135 (9th Cir. 2001).

B.      Analysis

Defendants argue that they are entitled to summary judgment on plaintiff's three cognizable § 1983 claims for damages against them: (1) Burpo, De Leon, Altunc and France were deliberately indifferent to plaintiff's health and safety by intentionally poisoning plaintiff's food; (2) De Leon, Altunc and France retaliated against plaintiff for reporting that Burpo was poisoning his food, by

further poisoning, verbally assaulting and otherwise harassing plaintiff; and (3) Chappell and Barnes were deliberately indifferent to plaintiff's health and safety by failing to protect him.

> 1.    Poisoning Plaintiff's Food

A prison official violates the Eighth Amendment only if two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, and (2) the prison official possesses a sufficiently culpable state of mind.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).  In prison-conditions cases, the requisite state of mind to establish an Eighth Amendment violation is one of deliberate indifference to inmate health or safety.  Id.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Id. at 837, 844.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Id. at 837.

In order to establish a claim for damages against an individual prison official under § 1983, a plaintiff also must set forth evidence showing that the specific prison official's deliberate indifference was the "actual and proximate cause" of the deprivation of plaintiff's Eighth Amendment rights.  Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988).

Defendants argue that they are entitled to summary judgment on plaintiff's claim that Burpo, De Leon, Altunc and France were deliberately indifferent to plaintiff's health and safety by poisoning his food because plaintiff has set forth no objective evidence that he was poisoned (and consequently suffered a serious harm brought on by being poisoned), or that Burpo, De Leon, Altunc or France caused the alleged poisoning.  Defendants also argue that plaintiff's medical

records contradict his claim that he was poisoned because the records instead show that plaintiff suffered only from indigestion and a possible ulcer, both of which were treated with medication.  In support, defendants submit documentary evidence showing the following:

On June 14, 2011, plaintiff was seen by medical staff for multiple complaints, including "white growth on his tonsils, nasal congestion, ringworm on the abdomen[, and] increased flatulence the past two months.  He denies any blood in the stools . . . .  He has no nausea or vomiting."  Van Loh Decl. Ex. B (ECF No. 120-2) at 3.  He was diagnosed with dyspepsia (indigestion) with increased flatulence and prescribed "simethicone" to address it.  His weight was 187 pounds, down four pounds since his last visit.

On July 15, 2011, plaintiff was seen by medical staff for allergies.  He reported that the simethicone was helping improve his dyspepsia and that he had not experienced any nausea or vomited.  Plaintiff "has been attempting to lose weight to help lower his blood pressure.  He actually lost 11 pounds since his last visit."  Id. at 4.  His weight was 176 pounds.  The notes state, "Resolved dyspepsia."  Id. at 5.

On September 7 and 13, 2011, plaintiff reported to his dentist that his general health was good, and that he had not experienced any diarrhea, vomiting, nausea or stomach problems.

On September 19, 2011, plaintiff was seen by medical staff for follow-up on face lacerations and a small bone fracture on his jaw after an altercation with another inmate.  He reported that dyspepsia was "not an issue" and that he "has no difficulty eating."  Id. at 8.  His weight was recorded at 181 pounds, up five pounds since the last visit.  Plaintiff expressed concern about a growth on his left tonsil, which he worried might be malignant.  Blood and urine tests from October

11, 2011, revealed slightly low glucose levels, but were otherwise normal.

On October 21, 2011, plaintiff was seen by medical staff for a follow-up visit.  He again expressed concern about a cyst on his tonsil, which the doctor did not believe required removal, and worried that he might have a kidney infection and/or an ulcer.  He reported that he was "able to eat and has gained weight."  Id. at 11.  His weight was 185 pounds, up four pounds since the last visit.  Medical staff ordered tests for plaintiff's complete blood count (CBC), vitamin D level and a serum antigen for H. pylori[1] because "the patient persists that he has an ulcer."  Id. at 12.

On November 7, 2011, plaintiff was informed that he needed to "start antibiotics" for his upset stomach because the H. pylori test had come back "nearly positive."  Id. at 13 (emphasis in original).  A urine test on that same day showed trace amounts of keytones, protein and bacteria, but a subsequent urine test on November 23, 2011 came back normal.

On December 1, 2011, plaintiff was seen by medical staff following observation for "suicidal ideation."  Id. at 19.  He was started on the anti-depressant "sertraline" and "currently states he is feeling much more stable. Apparently, he felt that Custody had been putting foreign objects in his food, as well as spraying pepper spray in his food."  Id.  "Quite happy he is out of segregation."  Id.  He states he currently "has no suicidal ideations or the need to hurt others."  Plaintiff's weight was recorded as 175 pounds, down ten pounds since his last visit, and H. pylori test was equivocal.  But a subsequent H. pylori test on December 23, 2011 showed that the issue was resolved.

On February 22, 2012, plaintiff reported "spasms in stomach."  Id. at 22.

---

[1]Helicobacter pylori (H. pylori) is a type of bacteria that lives in the digestive tract and can cause ulcers.

He also told medical staff that he "has continued concerns that Custody is poisoning his food." Id. at 23. Medical staff noted that "[w]e have done a number of tests in the past, but the patient insists that he be checked for 'organ damage.' He states it is not normal that he feels Custody is watching him. He currently is taking sertraline . . . [and] I am not seeing that he has a diagnosis of paranoid schizophrenia." Id. Plaintiff's weight was recorded as 175 pounds and he denied diarrhea, vomiting or nausea. Medical staff ordered "a [comprehensive metabolic panel (CMP)], hepatitis A and B serologies, vitamin D level, and a UA so I can show patient that his laboratory studies are within normal limits." Id. Medical staff also noted plaintiff's diagnosis of major depression and that "[t]here is a component of paranoia here." Id. Plaintiff's lab results came back normal, except his glucose levels were slightly low.

On March 1, 2012, medical staff took biopsies of bumps on plaintiff's nose and abdomen for skin cancer screening, and both returned normal results.

On March 15, 2012, medical staff saw plaintiff for a follow-up visit on the biopsies. Medical staff noted that plaintiff "has been requesting screening laboratory studies after he had daily GI discomfort after the food delivered to him in Administrative Segregation []. Concerned that he may have been poisoned. He has had no further sequelae since leaving that unit . . . ." Id. at 32. Plaintiff's weight was recorded as 170 pounds.

On June 8, 2012, plaintiff was seen by medical staff for "bloating and flatulence after meals." Id. at 33. Medical staff noted that plaintiff "feels it is due to a 'caustic substance in his food' and looking at his last note he felt that he may be being poisoned. The patient has no nausea, vomiting or abnormal stools." Id. Medical staff ordered a trial of simethicone to address plaintiff's abdominal discomfort.

On June 22, 2012, plaintiff was seen by medical staff for a buttock lesion and weight loss.  Medical staff noted that plaintiff "states he is eating a normal diet.  He had laboratory studies done in February that showed normal CMP, vitamin D normal, hepatitis B immune."  Id. at 34.  Plaintiff's weight was recorded as 161 pounds.  Medical staff ordered a TSH (thyroid stimulating hormone) test, which came back normal.

On July 26, 2012, plaintiff reported that he was poisoned at the AC.  He expressed concern that "he was given 'caustic material' in his food" and requested a renal function panel.  Id. at 36.  He also expressed concern with weight loss and having a tape worm.  Plaintiff's weight was recorded as 168 pounds.  Medical staff noted that plaintiff "is somewhat paranoid, stating he is going to sue the entire State."  Id.  Medical staff "will check a vitamin D level, blood sugar, stool for ova and parasites and culture as well as a CMP to reassure this patient that he has none of the above issues.  He is seeing Psychiatry.  He denied the need to hurt himself or others, but he is exhibiting some paranoid behavior."  Id.

On July 30, 2012, plaintiff was given a CMP, vitamin D, hemoglobin A1C and TSH tests, all of which were normal.  On July 31, 2012, plaintiff submitted a stool sample for multiple tests, which revealed no abnormalities.

On August 17, 2012, plaintiff was seen by medical staff for laboratory review.  Plaintiff had been concerned about having been poisoned at the AC.  "He underwent a [CMP] which included renal functioning testing.  He also had issues with perceived weight loss."  Id. at 44.  Plaintiff's weight was recorded as 172 pounds.  Medical staff noted that plaintiff "is much less paranoid today."  Id.  Plaintiff had normal test results and his body mass index was "completely normal."  Id.  Medical staff and plaintiff "discussed the patient's good health, that

his kidneys and liver were functioning perfectly normal, and he does not have a tapeworm." Id.

Defendants correctly argue that they are entitled to summary judgment on plaintiff's claim that Burpo, De Leon, Altunc and France were deliberately indifferent to plaintiff's health and safety by poisoning his food. Although plaintiff declares that he became ill after eating most meals starting in June 2011, he sets forth no significantly probative evidence that he suffered a substantial risk of serious harm brought on by poisoning. See Anderson, 477 U.S. at 249-50. Plaintiff's medical records show that when he complained of abdominal discomfort, medical staff diagnosed him with dyspepsia/indigestion and then possible H. pylori, and successfully treated him. And when he began to complain that he had been poisoned, medical staff ordered a series of comprehensive tests to assuage his fears and all came back normal. On this record, plaintiff's mere speculation that his meals must have been poisoned is not enough to survive summary judgment. See Rivera v. Nat'l R.R. Passenger Corp., 331 F.3d 1074, 1078 (9th Cir.) (conclusory allegations unsupported by factual data cannot defeat summary judgment), amended, 340 F.3d 767 (9th Cir. 2003); Leer, 844 F.2d at 634 (same). Plaintiff's claim that he did not become ill when he received sealed Ramadan meals in August 2011 does not compel a different conclusion. No reasonable jury could conclude that because plaintiff felt ill after he ate most of the unsealed meals he received while at ad seg, the meals were poisoned. See Anderson, 477 U.S. at 248.

Even if plaintiff had suffered a significant risk of serious harm brought on by poisoning, he has set forth no significantly probative evidence that Burpo, De Leon, Altunc or France actually and proximately caused the poisoning of which he complains. See Leer, 844 F.2d at 634. Again, plaintiff's claim rests on his

speculation that Burpo, De Leon, Altunc and France must have poisoned him because he became ill after eating meals served by them. But plaintiff did not see any of these defendants put anything in his food.[2] Nor did any of the inmates who provided declarations in support of plaintiff's claim. The declarations at most support plaintiff's allegations that Burpo, De Leon, Altunc and France verbally abused and harassed plaintiff, which the court already found do not state a cognizable claim for damages under § 1983. Accord Freeman v. Arpaio, 125 F.3d 732, 738 (9th Cir. 1997) (allegations of verbal abuse and harassment fail to state a claim cognizable under § 1983), overruled in part on other grounds by Shakur v. Schriro, 514 F.3d 878, 884-85 (9th Cir. 2008).[3] Plaintiff's additional speculation that Burpo, De Leon, Altunc and/or France must have caused his H. pylori by poisoning him does not compel a different conclusion. See Rivera, 331

---

[2]Nor did plaintiff see any of the other unnamed SQSP officials he also claims poisoned him (both while he was in ad seg and after he was released from ad seg) put anything in his meals.

[3]Plaintiff argues that his allegations that De Leon, Altunc and France called him a snitch in front of other inmates are corroborated by his declarants, and establish a violation of his Eighth Amendments rights. Not so. While in some instances deliberately spreading a rumor that a prisoner is a snitch may amount to a violation of the right to be protected from violence, see Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir. 1989), this is not one of those instances. In Valandingham, the actions of the correctional officer defendants were of such gravity and persistence that the prisoner plaintiff was assaulted by other inmates on two separate occasions over a period two years. See Valandingham v. Moen, No. 91-15714, 1992 WL 102662, at *1 (9th Cir. May 14, 1992) (unpublished memorandum disposition). But plaintiff here was never assaulted as a result of allegedly being called a snitch in front of other inmates in ad seg. Nor is there any indication that he was ever in danger of being assaulted as a result of being called a snitch, or even in fear of being assaulted as a result of being called a snitch. Plaintiff does not establish a § 1983 claim for damages for a violation the right to be protected from violence because "speculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm." Williams v. Wood, 223 Fed. Appx. 670, 671 (9th Cir. 2007). See also 42 U.S.C. § 1997e(e) (no action may be brought by prisoner for mental or emotional injury while in custody without prior showing of physical injury).

F.3d at 1078.  Put simply, the evidence in the record does not support a finding or reasonable inference that Burpo, De Leon, Altunc or France poisoned plaintiff's food.  On this record, no reasonable jury could conclude that Burpo, De Leon, Altunc or Frace actually and proximately caused the poisoning of which plaintiff complains.  See Anderson, 477 U.S. at 248.

Defendants are entitled to summary judgment on plaintiff's claim that Burpo, De Leon, Altunc and France were deliberately indifferent to plaintiff's health and safety by poisoning his food.  See Celotex, 477 U.S. at 323.

2.    Retaliation

To prevail on a First Amendment retaliation claim, a prisoner must show:  (1) that a state actor took some adverse action against a prisoner (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the prisoner's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).

The prisoner must prove all the elements of a retaliation claim, including the absence of legitimate correctional goals for the conduct of which he complains.  Pratt v. Rowland, 65 F.3d 802, 806 (9th Cir. 1995).  But the prisoner need not prove a total chilling of his First Amendment rights; that his First Amendment rights were chilled, though not necessarily silenced, is enough.  Rhodes, 408 F.3d at 569.

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'"  Pratt, 65 F.3d at 807 (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)).  In particular, courts should "'afford appropriate deference and

14

flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." Id.

Defendants argue that they are entitled to summary judgment on plaintiff's claim that De Leon, Altunc and France retaliated against plaintiff for reporting that Burpo was poisoning plaintiff's food, by further poisoning, verbally assaulting and otherwise harassing plaintiff, because plaintiff has set forth no evidence that De Leon, Altunc or France knew that plaintiff had reported Burpo or that they decided to punish him for it.  The court agrees.

Plaintiff admitted at his deposition that he has no direct evidence that De Leon, Altunc or France acted against plaintiff because of plaintiff's reporting of Burpo: "I guess I would just have to say I drew an inference based on the proximity and time, the fact that [Burpo] got disciplined, fired, transferred, or whatever, and then the fact that the harassment and these comments like snitch and rat and other terms started – I don't know, there was never a direct statement like I'm calling you a rat right now because you filed a grievance against Correctional Officer [Burpo] . . . ."  Pl's Depo. at 174-75.  But plaintiff's "inference" is no more than speculation and not enough to defeat summary judgment.  See Wood v. Yordy, 753 F.3d 899, 905 (9th Cir. 2014) (speculation that defendants acted out of retaliation is not sufficient).

"In the First Amendment context, a plaintiff creates a genuine issue of material fact on the question of retaliatory motive when he or she produces, in addition to evidence that the defendant knew of the protected speech, at least (1) evidence of proximity in time between the protected speech and the allegedly retaliatory decision, (2) evidence that the defendant expressed opposition to the speech or (3) evidence that the defendant's proffered reason for the adverse action was false or pretextual."  Corales v. Bennett, 567 F.3d 554, 568 (9th Cir.

2009) (internal quotation marks and citation omitted) (emphasis in original).  But plaintiff here produces no evidence that De Leon, Altunch or France knew that plaintiff reported Burpo, expressed opposition to plaintiff reporting Burpo, or proffered a false or pretextual reason for their adverse actions.  At most, plaintiff produces evidence of proximity in time between his protected speech and the allegedly retaliatory actions, which can be considered circumstantial evidence of retaliatory intent but alone is insufficient to establish retaliatory motive.  See Pratt, 65 F.3d at 808 (finding timing between protected speech and allegedly retaliatory action insufficient to support inference of retaliatory intent where there was no evidence that defendants were aware of plaintiff's protected speech).

Defendants are entitled to summary judgment on plaintiff's claim that De Leon, Altunc and France retaliated against plaintiff for reporting Burpo by poisoning, verbally assaulting and otherwise harassing plaintiff, because plaintiff has set forth no evidence that De Leon, Altunc or France knew that plaintiff had reported Burpo or that their alleged actions were in retaliation for plaintiff's grievance/letter reporting Burpo.  Accord Wood, 753 F.3d at 904-05 (summary judgment properly granted in favor of one defendant because nothing in the record showed that defendant knew about protected speech, and properly granted in favor of second defendant because no evidence showed that defendant knew about protected speech or that claimed harassment by defendant was in retaliation for the protected speech).  Plaintiff's mere speculation that De Leon, Altunc and France must have acted out of retaliation does not compel a different conclusion.  See Wood, 753 F.3d at 905; see also Corales, 567 F.3d at 568 (conclusory allegations of retaliation insufficient to prevent summary judgment).

       3.     Failure to Protect

Defendants argue that they are entitled to summary judgment and

qualified immunity on plaintiff's claim that Barnes and Chappell were deliberately indifferent to plaintiff's health and safety by failing to protect plaintiff after they were told that correctional officers were poisoning and harassing him.  Under Saucier v. Katz, 533 U.S. 194 (2001), the court must undertake a two-step analysis when a defendant asserts qualified immunity in a motion for summary judgment.  The court first faces "this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  533 U.S. at 201.  If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity.

If the court determines that the conduct did violate a constitutional right, it then moves to the second step and asks "whether the right was clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Id. at 201-02.  Even if the violated right was clearly established, qualified immunity shields an officer from suit when he makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he confronted.  Brosseau v. Haugen, 543 U.S. 194, 198 (2004); Saucier, 533 U.S. at 205-06.  If "the officer's mistake as to what the law requires is reasonable . . . the officer is entitled to the immunity defense."  Id. at 205.[4]

The Eighth Amendment requires that prison officials take reasonable measures to guarantee the safety of prisoners.  Farmer v. Brennan, 511 U.S. 825, 832 (1994).  In particular, prison officials have a duty to protect prisoners from

---

[4]Although the Saucier sequence is often appropriate and beneficial, it is not mandatory.  A court may exercise its discretion in deciding which prong to address first, in light of the particular circumstances of each case.  See Pearson v. Callahan,  555 U.S. 223, 236 (2009).

violence at the hands of other prisoners and from dangerous conditions at the prison.  See id. at 833; Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005); Frost v. Agnos, 152 F.3d 1124, 1128-29 (9th Cir. 1998).  But the failure of prison officials to protect inmates from attacks by other inmates or from dangerous conditions at the prison violates the Eighth Amendment only if two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious; and (2) the prison official is deliberately indifferent to inmate health or safety.  Farmer, 511 U.S. at 834.

A prison official is deliberately indifferent if he knows of and disregards an excessive risk to inmate health or safety by failing to take reasonable steps to abate it.  Id. at 837, 844.  The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Id. at 837.  If the official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment.  Id. at 838; Jeffers v. Gomez, 267 F.3d 895, 914 (9th Cir. 2001).

Defendants argue that they are entitled to summary judgment on plaintiff's claim that Barnes and Chappell were deliberately indifferent to plaintiff's health and safety by failing to protect him from correctional officers poisoning and harassing him because plaintiff has set forth no evidence that either Barnes or Chappell was aware of and disregarded a substantial risk of serious harm to plaintiff.  Defendants specifically argue that plaintiff has not shown either that he suffered a substantial risk of serious harm, or that Barnes or Chappell believed plaintiff suffered a substantial risk of serious harm and consciously disregarded the risk.

The court concluded earlier in this order that plaintiff has set forth no significantly probative evidence that he suffered a substantial risk of serious harm

brought on by poisoning.  And it also concluded that plaintiff's allegations that correctional officers verbally abused and harassed him, although troubling, do not state a cognizable claim for damages under § 1983.  Nor do they amount to a showing of substantial risk of serious harm.  But even if plaintiff had suffered a substantial risk of serious harm, Barnes and Chappell are entitled to summary judgment because plaintiff has set forth no significantly probative evidence that either Barnes or Chappell knew that plaintiff suffered a substantial risk of serious harm and disregarded that risk by failing to take reasonable steps to abate it.  See Farmer, 511 U.S. at 837-38, 844; Jeffers, 267 F.3d at 914.

The undisputed facts in the record show that after plaintiff told Barnes on May 21, 2011 that Burpo had poisoned plaintiff's food on May 20, 2011, Barnes transferred plaintiff to another section in ad seg.  And after plaintiff told Barnes on November 4, 2011 that De Leon, Altunc and France had subjected him to food poisoning and harassment, Barnes allowed plaintiff to transfer to any tier and section in ad seg that he wanted.  Plaintiff nonetheless argues that Barnes should have done more.  But all Barnes was required to do was take reasonable steps to abate a substantial risk of serious harm.  See Farmer, 511 U.S. at 844.  In view of plaintiff's unsupported claims to Barnes that first Burpo, and then De Leon, Altunc and France, had poisoned his food, Barnes' response to transfer plaintiff twice to another section and tier in ad seg was more than a reasonable step to abate a no-more-than-merely-possible risk of serious harm.  Barnes is entitled to summary judgment because no reasonable jury could find that Barnes disregarded a substantial risk of serious harm to plaintiff by failing to take reasonable steps to abate it.  See Anderson, 477 U.S. at 248.

At minimum, Barnes is entitled to qualified immunity from damages on plaintiff's claim that Barnes failed to protect plaintiff from correctional officers

poisoning his food in violation of the Eighth Amendment because a reasonable correctional officer could have believed that his conduct was lawful under the circumstances.  See Saucier, 533 U.S. at 201-02.  A reasonable correctional officer could have believed that transferring plaintiff to another section and tier in ad seg was more than a reasonable step to abate a no-more-than-merely-possible risk of serious harm, and therefore was lawful.

Plaintiff has submitted declarations and documentary evidence in support of his claim that Chappell was "informed" by his mother and others that plaintiff was being "subjected to continuous and ongoing poisoning," "verbal abuse" and other "harassment and mistreatment," and yet "took no steps to protect plaintiff." SAC at 12-13.  But plaintiff's own evidence shows that Chappell did not disregard the complaint of staff misconduct towards plaintiff; instead, Chappell "referred" it to "E. Melton, San Quentin Investigative Services Unit Lieutenant for appropriate action/review."  Pl.'s Req. for Judicial Notice (ECF No. 150) Ex. D at 1.  Plaintiff argues that Chappell should have done more, but there is no indication that any of the investigations into the matter revealed any wrongdoing and, like Barnes, all Chappell was required to do was take reasonable steps to abate a substantial risk of serious harm.  See Farmer, 511 U.S. at 844.  Chappell is entitled to summary judgment because no reasonable jury could find that, on the evidence in the record, Chappell knew of and disregarded a substantial risk of serious harm to plaintiff by failing to take reasonable steps to abate it.  See Anderson, 477 U.S. at 248.

At minimum, Chappell is entitled to qualified immunity from damages on plaintiff's claim that Chappell failed to protect plaintiff in violation of the Eighth Amendment because a reasonable prison official could have believed that his conduct was lawful under the circumstances.  See Saucier, 533 U.S. at 201-02.  A

20

reasonable prison official could have believed that referring the complaint of staff misconduct towards plaintiff to the prison's investigative services unit for action/review was a reasonable step to abate a no-more-than-merely-possible risk of serious harm, and therefore was lawful.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (ECF No. 114) is GRANTED, and plaintiff's cross-motions for summary judgment (ECF Nos. 94 & 125) are DENIED.[5] [6]

The clerk shall enter judgment in favor of defendants and close the file.

SO ORDERED.

DATED: January 5, 2017

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\CR.14\Jackson, C.14-3108.msj.wpd

---

[5] In view of the court's conclusion that defendants are entitled to summary judgment on the merits of plaintiff's claims, it need not also address whether plaintiff exhausted available administrative remedies.

[6] Plaintiff's last-minute miscellaneous motions and requests (see, e.g., ECF Nos. 168 & 169) are denied as moot and for lack of merit.